**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XL Specialty Insurance Company,<br><br>Plaintiff,<br><br>-against-<br><br>Ideal Stamp Company and Inter Governmental Philatelic Corp., d/b/a Imperial Mint,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>**Case No. 1:26-cv-00537 (LDH) (JRC)** |

Plaintiff XL Specialty Insurance Company ("XL Specialty"), by its attorneys Mound Cotton Wollan & Greengrass LLP, as and for its First Amended Complaint against defendants Ideal Stamp Company ("Ideal Stamp") and Inter Governmental Philatelic Corp. d/b/a Imperial Mint ("IGPC") (together "Defendants"), allege upon information and belief as follows:

## INTRODUCTION

1. XL Specialty seeks a declaration pursuant to 28 U.S.C. Section 2201(a) rescinding policy number UMA0017371SP23A, effective December 28, 2023 to December 28, 2024, issued to Defendants (the "Policy") and finding the Policy to be void *ab initio*.

2. XL Specialty seeks rescission based on material misrepresentations and/or material omissions made by Defendants in procuring the Policy. Had XL Specialty been aware of the true facts, it would not have issued any policy to Defendants or would not have issued the Policy.

3. Alternatively, if the Policy is not rescinded, XL Specialty seeks a declaration that there is no coverage under the Policy based on Defendants' breach of certain Policy terms and conditions and/or because the Policy expressly excludes coverage.

4. An actual controversy exists between XL Specialty and Defendants concerning the parties' respective rights and obligations under the Policy.

**PARTIES**

5. XL Specialty is a Delaware corporation with its principal place of business in Stamford, Connecticut.

6. Upon information and belief, Ideal Stamp is a New York company with its principal place of business in Brooklyn, New York.

7. Upon information and belief, IGPC is a New York corporation with its principal place of business in Brooklyn, New York.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship between XL Specialty and Defendants and the amount in controversy exceeds $75,000 exclusive of costs.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) based on the residence of Defendants and under 28 U.S.C. § 1392(b)(2) because a substantial part of the events giving rise to this action occurred in the Eastern District of New York.

**BACKGROUND**

***INSURANCE APPLICATION & POLICY***

10. On November 7, 2019, Defendants submitted an insurance application to XL Specialty on a "FACE Insurance Services" form (the "Insurance Application").

11. In the Insurance Application, Defendants identified their "Gallery," located at 172 Empire Blvd, Brooklyn, and two "Other Named Locations," one at 32 Jefferson St., Monticello,

New York ("Storage location"), and another at 756 Eastern Parkway, Brooklyn, New York ("Executive residence where inventory is stored").

12. Defendants stated in the Insurance Application that the "Average Monthly Total Value of Inventory on Premises" and the "Maximum Monthly Total Value of Inventory on Premises" at the "Other Locations (storage, etc.)" was $15 million:

| Average Monthly Total Value of Inventory on Premises: | Owned (selling price) | Consigned |
|---|---|---|
| At Gallery: | $5,000,000.00 | |
| At Other Locations (storage, etc.) | $15,000,000.00 | |
| **Maximum Monthly Total Value of Inventory on Premises:** | | |
| At Gallery: | $5,000,000.00 | |
| At Other Locations (storage, etc.) | $15,000,000.00 | |

Other Named Locations: (Describe use, etc.):

1. 32 Jefferson St Monticello NY 12701 - Storage location
2. 756 Eastern Parkway Brooklyn NY 11213 - Executives residence, where inventory is stored

13. In addition, Defendants represented in the Insurance Application that the "Highest Priced Item for sale" was $1,000 and that the "Average price of items for sale" was $10.

14. Defendants also confirmed in the Insurance Application that their inventory was valued at "Market Value:"

| | | | |
|---|---|---|---|
| Date of last inventory: | | Highest Priced item for sale: | $1,000.00 |
| Average price of items for sale: | $10.00 | How is inventory valued: | Market Value |

15. Defendants' representations to XL Specialty in November 2019 were consistent with earlier statements they made to XL Specialty through their broker regarding the total inventory valuation among the three locations: "172 Empire has about $5 mil max, 32 Jefferson has between $10-15mm, Eastern Parkway address is very minimal temporary storage."

16. On November 7, 2019, XL Specialty provided a "New Submission Quote" setting out various proposed terms, including a maximum policy limit of $15 million per occurrence for the "Named Locations." The New Submission Quote expressly stated that the terms were "[b]ased on the information provided" and "[s]ubject to … no material changes."

17. Defendants accepted the terms and XL Specialty bound coverage effective December 28, 2019 – December 28, 2020.

18. In the following years, including 2023, XL Specialty provided Defendants and/or their broker or agent "Renewal Quotes" with proposed terms, including a maximum policy limit of $15 million per occurrence for the "Named Locations."

19. The October 6, 2023 Renewal Quote ("2023 Renewal Quote") for the Policy expressly stated that the terms were "[b]ased on the information provided" and "[s]ubject to … no material changes:"

> AXA
>
> XL Insurance
>
> Quote for: QUMA026395SP23A
>
> **Renewal Quote**
>
> Based on the information provided, we are pleased to offer the following terms. This Renewal Quote is Subject to no losses prior to commencement of the policy term and/or no material changes.
>
> **This quote is open until 12/28/2023**
>
> **Named Insured:** Ideal Stamp Company & Inter Governmental Philatelic Corp. DBA Imperial Mint

20. The 2023 Renewal Quote showed premium of $38,735.

21. The Policy likewise reflected premium of $38,735:

**Premium and Surcharges**

**Payment Plan:** Single Payment due in full at the inception of this policy term

The total cost of the above numbered policy is as stated below.

| | | | |
|---|---|---|---|
| **Total Policy Premium:** | **$** | 38,735.00 | |
| **State Surcharge (if applicable):** | | N/A | |
| **Total Cost of Policy:** | **$** | 38,735.00 | $1490.00 TRIA Premium Included |

**XL-CFA-DEC (07/19)** **Page 2 of 3**

22. XL Specialty's "FA Combined Commercial Model User Guide" was an exposure model for commercial risks such as Defendants and was the Fine Art Commercial model applicable to underwriters based in the United States (hereinafter "Underwriting Guidelines").

23. The Underwriting Guidelines stated that the "premium rate" for "stay risks" (as opposed to "transit risks") was derived from considering various factors, including "Total Insured Value," or TIV:

The stay risk premium/rate is derived taking into account :

- Total Insured Value
- Policy Type: Primary, Excess or Full Value.
- Deductibles
- Number of risk locations
- Class Adjustment Factor
- % of Fragile Objects
- Risk assessment factor via the risk assessment tool
- Loss history load/discount

24. The Underwriting Guidelines further stated that "Full value TIV (or best guess of TIV) should always be entered:"

Underwriting rules regarding the Pricing by class:

- The number of locations aggregated in each row should be indicated
- The risk assessment categorisation should reflect the class's average.
- Full value TIV (or best guess of TIV) should always be entered.
- TIV, limit, excess, deductible should all be entered at 100% share.

25. In issuing the Policy, XL Specialty developed the premium using a "Fine Art Commercial Fine Art/Commercial Inland Marine US Regulatory Rating" sheet ("Rating Sheet"):

AXA XL Fine Art Commercial Fine Art/Commercial Inland Marine US Regulatory Rating

XL Insurance

| | |
|---|---|
| Main Risk State Code | ny |
| Main Risk State | NY - New York |
| Insured | er Governmental Philatelic Corp. DBA Imperial Min |
| Policy Number | UMA0017371SP23A |
| Quote Number | QUMA026395SP23A |
| Inception Date | 12/28/2023 |
| Expiration Date | 12/28/2024 |
| Broker | Oak Tree Insurance Services LLC |
| Commission | 15.0000% |
| Currency | USD |

Model Version 3.0

**General Comments**

Ideal Stamp Company is the world's leading philatelic agency, representing over 70 governments in the production, distribution, and marketing of their nation's postage stamps. All of the postage stamps produced by IGPC are fully authorized, government approved, and for sale at the post offices in the issuing countries. Website: https://www.igpc.com/about.cfm 3 NY locations. No claims.

26. Under "Filed Base Rates," the Rating Sheet applied a "Selected Base Rate" of 0.350000 (.0035 of 1%) to the "Total Insured Value" of $15,000,000 to arrive at a "Base Premium" of $52,500:

Filed Base Rates

| Class | Coverage | Number of Risks | Limit | Deductibles | Total Insured Value (TIV) | Range of Base Rates | | Selected Base Rate | Base Premium |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Min | Max | | |
| Dealer (Stamps) | Premises | 1 | 15,000,000 | 1,000 | 15,000,000 | 0.3500 | 0.3500 | 0.3500 | 52,500 |

27. The $15,000,000 in "Total Insured Value" was based on Defendants' representation in the Insurance Application that the "Average Monthly Total Value of Inventory on Premises" and the "Maximum Monthly Total Value of Inventory on Premises" at the "Other Locations (storage, etc.)" was $15,000,000.

28. The "Base Rate" was reduced by applying additional "Implied Rates" to arrive at a "Final UW Selected Class Rate" of 0.248304, which resulted in a "Final UW Selected Class Premium" of $37,246:

| Implied Rates | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Class & Coverage | Base Rate After Deductible and Limit Adjustment | Implied Adjustment to Base Rates Mod | Implied Cover Specific Mod | Implied Individual Risk Mod | Selected Individual Risk Mod | Implied UW Judgment Mod | Selected UW Judgment Mod | Final UW Selected Class Rate | Final UW Selected Class Premium |
| Dealer (Stamps) - Premises | 0.350000 | -20.000000% | -11.320000% | 0.000000% | 0.000000% | 0.000000% | 0.000000% | 0.248304 | 37,246 |

29. After adding $1,490 in "Terrorism Premium" to the $37,246 "Final UW Selected Class Premium," the "Total Premium Charged" was $38,736:

| Summary | |
|---|---|
| All Other (excl. Nat Cat and Terrorism) | 37,246 |
| Terrorism Premium | 1,490 |
| Total | 38,736 |
| AXA XL Share | 100.000% |
| AXA XL Total Charged Premium | 38,736 |

30. Based on Defendants' affirmative representations in the Insurance Application that the "Market Value" of their "Inventory" was $15 million and their subsequent confirmation and acquiescence in the 2023 Renewal that there were no material changes, XL Specialty issued the Policy and calculated premium using a "Total Insured Value" of $15 million.

## *POLICY PROVISIONS*

31. The Policy contains the following provisions:

> **COMMERCIAL DEALER POLICY**
>
> **A. AGREEMENT**
>
> We will provide the insurance described in this Policy in return for the Premium and compliance with all applicable provisions of this Policy.
>
> * * *
>
> **D. EXCLUSIONS**
>
> We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event.

* * *

**12.** Any fraudulent, dishonest, or criminal act or acts by:

**a.** You, anyone else with an interest in the Covered Property or your or their employees whether or not committed alone or in collusion with others, whether or not such act or acts be committed during the hours of employment; or

**b.** Anyone entrusted with the Covered Property. This exclusion does not apply to a carrier for hire.

* * *

**F. CONDITIONS OF COVERAGE**

**1. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this Policy at any time during the policy period and up to three years afterward.

* * *

**COMMON POLICY CONDITIONS**

* * *

**F. Concealment, Misrepresentation, or Fraud [as modified by New York Changes]**

We do not provide coverage for any insured ("insured") who has made fraudulent statements or engaged in fraudulent conduct in connection with any loss ("loss") or damage for which coverage is sought under this policy

* * *

**K. Duties in the Event of Loss**

In the event of "loss" to Covered Property, you must:

* * *

**6.** Permit us to inspect the property and records proving "loss."

**7.** If requested, permit us to question you under oath, at such times as may be reasonably required, about any matter relating to this insurance or your claim, including your books and records.

**8.** Send us a signed Sworn Statement in Proof of Loss containing the information we request to settle the claim. You must do this within 90 days after our request. We will supply you with the necessary forms.

***INSURANCE CLAIM***

32. On October 27, 2024, Defendants reported the loss of stamps due to a fire at their warehouse located at 32 Jefferson Street, Monticello, New York (the "Claim").

33. The next day, October 28, 2024, the Village of Monticello issued a violation and condemnation notice, stating in part: "Unsafe Structure Due to Structure Fire, Building Partially collapsed. Building needs to be demolished due to being … a hazard to public life and safety:"

Village of Monticello
**BUILDING DEPARTMENT**
2 Pleasant St
Monticello, NY 12701
P: 845-794-6130 EXT 302
Email: Code1@villageofmonticello.com

Jefferson Upstate LLC
668 Eastern Pkwy
Brooklyn, NY 11213

**CODE AND ORDINANCE VIOLATION NOTICE**

10/28/2024 Complaint No: 2024-1255

**TO THE OWNER OR PERSON IN CHARGE OF THE PROPERTY DESCRIBED BELOW:**
Name of Owner: Jefferson Upstate LLC
PREMISES ADDRESS: 32 Jefferson St S.B.L.: 106.-1-2

Please take notice that on 10/28/2024, this office inspected the above address. In doing so, the Code Enforcement Officer observed the following:

**Unsafe Structure Due to Structure Fire, Building partially collapsed. Building needs to be demolished due to being a hazard to adjacent building as well as being a hazard to public life and safety.**

Village of Monticello
**BUILDING DEPARTMENT**
2 Pleasant St, Monticello, NY 12701
P: 845-794-6130 EXT 302
Email: Code1@villageofmonticello.com

**NOTICE**

**32 Jefferson St (106.-1-2)**

**Is hereby:**

**CONDEMNED**

**The structure contained within the walls of this building is**
**UNFIT FOR HUMAN OCCUPANCY AND/OR AN UNSAFE STRUCTURE**

"This building has been found to be unfit for human occupancy and/or unsafe building by the Building Inspector. This notice is to remain on this building until it is repaired, vacated, or demolished in accordance with the notice which has been given to the owner or someone of the owner's executors, legal representatives, agents, or lessees or any other having a vested or contingent interest in the same, as shown by the records of the Assessor or in the office of the County Clerk, of any building found by me to be unfit for human occupancy and/or unsafe building within the standards set forth by Chapter 119-3 of the Code of the Village of Monticello. Occupancy is PROHIBITED until all violations are removed and a "Certificate of Occupancy" has been issued.

**It is unlawful to remove or deface this notice. Any persons found occupying a placarded structure is considered to be trespassing and will be punished to the fullest extent of the law.**

**Village of Monticello Building Department**
**2 Pleasant Street, Monticello, NY 12701**
**(845)794-6130 Ext 301**

Scott Cooper, Code Enforcement Officer

**Village of Monticello Police Department**
**2 Pleasant Street, Monticello, NY 12701**
**(845)794-4422**

Date Issued: 10/28/2024

34. On November 1, 2024, Yorquest Associates Ltd ("Yorquest Associates"), one of the investigators retained by XL Specialty, wrote to Superior Adjusters, Inc. ("Superior"), the public adjuster representing Defendants, stating with respect to the warehouse that "Nothing should be done until [XL Specialty] have been allowed to complete their investigation."

35. Photos of the site reflected that the warehouse had been destroyed:





36. Shortly after the fire, XL Specialty directed another of its investigators, Hayden Karn Consulting, Inc. ("Hayden Karn"), to schedule an interview with one of Defendants' officers, Joseph "Yossi" Malamud.

37. Yossi Malamud was interviewed on December 23, 2024.

38. Also present at the interview were, among others, Samuel Schlesinger and Shuly Schlesinger, from Superior Adjusters (the public adjuster), and Chesky Klein, from Oak Tree Insurance Company (Defendants' insurance broker).

39. Yossi Malamud's statements at the interview were set forth in a written document prepared by Hayden Karn dated December 26, 2024.

40. At the interview, Malamud stated that he was the "Secretary" of Ideal Stamp and engaged in the day-to-day operations of the company. He also stated that he was the sole owner of "Jefferson Upstate LLC," which owned the storage warehouse at 32 Jefferson Street, Monticello, New York.

41. Malamud confirmed at the interview that the stock located at 32 Jefferson Street had been accumulated over a 50-year period and that it was inventoried via computer with handwritten notes, which were most often developed into entries within the computerized inventory. According to Malamud, a customer could contact Defendants to place an order, and the order could be made by "stock number;" an example of a stock number that Defendants' employees could identify was "Box 47 located within Aisle 32." Per Malamud, this stock could be searched by computer.

42. XL Specialty wrote to Superior Adjusters on January 10, 2025 inquiring about the reason for Defendants' delay in providing inventory records.

43. On January 28, 2025, Superior Adjusters, on behalf of Defendants, sent the following letter to Andy Quested, of Yorquest Associates:

SUPERIOR ADJUSTERS INC.
EXPERIENCE | SERVICE | RESULTS

January 28, 2025

| | |
|---|---|
| INSURED: | Ideal Stamp Company & Inter Governmental Philatelic Corp. |
| LOSS LOCATION: | 32 Jefferson St. Monticello, NY 12701 |
| DATE OF LOSS: | 10/27/2024 |
| TYPE OF LOSS: | Fire |
| POLICY NUMBER: | UMA0017371SP23A |
| CLAIM NUMBER: | 0010639863 |
| INSURANCE COMPANY: | XL Specialty Insurance Co. |

Dear Mr. Quested,

Please find claim submission of damaged inventory, valued at selling price less 15% in connection to Ideal Stamps Co.

Presented herewith as part of our claim is an inventory representing $20,137,670. Insured reserves the right to amend claim if needed, as only a portion of the 900 pallets that were affected have been valued, to date.

Feel free to call me with any questions at 845 426 7200 x 211

Yours truly,

Samuel Schlesinger

44. Included with Superior Adjuster's January 28 letter was an excel spreadsheet (hereinafter the "Initial Claim Submission"). The Initial Claim Submission contained the following caption:

SUPERIOR ADJUSTERS INC.
EXPERIENCE | SERVICE | RESULTS
66 Route 59 Suite 200
Monsey, NY, 10952
845-426-7200
info@superioradjusters.com
www.superioradjusters.com

| | |
|---|---|
| INSURED: | Ideal Stamp Co Inc |
| LOSS LOCATION: | 32 Jefferson St. Monticello, NY |
| DATE OF LOSS: | 10/27/2024 |
| TYPE OF LOSS: | Fire |
| POLICY NUMBER: | UMA0017371SP23A |
| CLAIM NUMBER: | 0010639863 |
| INSURANCE COMPANY: | XL Specialty Insurance Co. |
| SELLING VALUE INVENTORY TOTAL: | $23,691,377.36 |
| LESS 15% AS PER POLICY | $20,137,670.76 |

45. The Initial Claim Submission had 304 rows, each containing a unique identification number in a column labeled "ID#." These rows also contained numbers for "Quantity," "Selling Price," and "Total Selling Price Value."

46. The Initial Claim Submission had a total "Quantity" of 3,153,139 items and the collective "Total Selling Price Value" for all items was $23,691,377.36.

47. On February 28, 2025, XL Specialty issued a Preliminary Reservation of Rights letter ("ROR Letter") to Defendants.

48. In the ROR Letter, XL Specialty identified a non-exhaustive list of Policy provisions that impacted XL Specialty's analysis of the Claim and upon which it was preliminarily reserving its rights. These included, but were not limited to, provisions barring coverage for fraudulent or dishonest acts.

49. The ROR Letter stated that XL Specialty "must examine and evaluate all of the available and previously requested (or subsequently requested) documents and other writings in order to make an informed decision regarding whether or not the policy provides coverage for the claim." The ROR Letter set forth XL Specialty's demand that Defendants produce, by March 21, 2025, copies of documents identified in 13 separately numbered requests. Without this information, XL Specialty advised, it was unable to move forward with the Claim.

50. One of the document requests in the ROR Letter was: "Records of the entire inventory of stamps stored at 32 Jefferson St., Monticello, NY 12701 between January 1, 2022 to the date of loss, including records reflecting when stamps entered into storage or removed therefrom."

51. The ROR Letter further stated that XL Specialty wished to conduct an Examination Under Oath (EUO) of Defendants "and examine them regarding the basis of their claim."

52. The ROR Letter set forth XL Specialty's "Preliminary Rights Reserved" as follows:

> **Preliminary Rights Reserved**
>
> AXA XL has determined there may be potential exposure not covered by the policy and is therefore reserving its rights to restrict payments to those owed pursuant to the insurance contract, if any. By conducting an investigation, AXA XL is not waiving any rights or defenses secured to AXA XL pursuant to the terms of the policy, nor are any of the insureds' rights jeopardized in any way.
>
> AXA XL reserves the right to continue its investigation into the coverage of this loss, if any. AXA XL reserves the right to recover from any insureds, and/or from any other insurer or any other parties, any payments made by AXA XL, including payments for indemnity, defense costs and expenses, attorneys' fees and costs of suit, if any, as applicable, under the policy.
>
> AXA XL further reserves the right to seek the rescission of the insurance contracts, or the reformation of their terms should facts be discovered which would make such an action appropriate.
>
> This letter describes various policy provisions which apply (or may apply), identifies coverage questions that we believe exist with respect to this loss, and sets forth AXA XL's current position with respect to such issues. It is to be expressly understood that AXA XL's continued investigation and handling of this matter is under a full reservation of rights.
>
> AXA XL reserves the right to review any additional facts given to them and make a separate determination with respect to coverage. AXA XL may rely on additional or different exclusionary terms or provisions contained in the referenced policy, if it discovers facts, which would make other terms of the policy applicable. Moreover, as stated above, the policy with AXA XL contains additional exclusions, which are potentially applicable to this loss.
>
> AXA XL would appreciate any input you have if you believe that we have misunderstood the facts or if you become aware of any additional information that may be relevant to AXA XL's coverage position. When, and if, this information is provided, AXA XL will review its coverage positions.
>
> Waiving none, but in all other respects reserving to AXA XL all of its rights and defenses under and pursuant to the policy of insurance involved herein, if you have any questions or concerns, please feel free to contact the undersigned.

53. On March 19, 2025, Defendants noted receipt of the ROR Letter and acknowledged that XL Specialty had requested "specific information and documentation by March 21, 2025." Defendants asked for a 45-day extension to respond.

54. On March 24, 2025, Superior Adjusters, on behalf of Defendants, submitted to XL Specialty a "Sworn Statement in Proof of Loss" stating that each of "Full Replacement Cost," "Actual Cash Value Loss," and "Actual Cash Value Claim" was "in an amount that exceeds policy limits:"

| | | | |
|---|---|---|---|
| 6. **Full Replacement Cost** of the said property at the time of the loss was | in an amount that exceeds policy limits | $ | 15,000,000 |
| 7. **The Full Cost of Repair or Betterment** | | $ | |
| 8. **Applicable Depreciation or Betterment is** | | $ | |
| 9. **Actual Cash Value Loss is (Lines 7 minus 8)** | in an amount that exceeds policy limits | $ | 15,000,000 |
| 10. **Less deductibles** and/or participation by the insured | | $ | |
| 11. **Actual Cash Value Claim is (Lines 9 minus 10)** | in an amount that exceeds policy limits | $ | 15,000,000 |
| 12. **Supplemental Claim**, to be filled in accordance with the terms and conditions of the Replacement Cost Coverage | | $ | |
| 180 days from the date of loss and shown above. (This figure will be that portion of the amounts shown on lines 8, which is recoverable. | | | |

55. That same day, March 24, 2025, XL Specialty informed Defendants that, due to "open requests for records and yet to be scheduled Examinations Under Oath," the "adjustment of the claim remains ongoing" and XL Specialty had not yet "received satisfactory proof of loss."

56. On May 9, 2025, Defendants provided written responses to the document requests set out in the ROR Letter, as well as a drop box link containing responsive documents.

57. In response to XL Specialty's request for "Records of the entire inventory of stamps stored at 32 Jefferson St. Monticello, NY 12701 between January 1, 2022 to the date of loss, including records reflecting when the stamps entered into storage or removed therefrom," Defendants produced an excel spreadsheet labeled as "Exhibit 5" (hereinafter the "Warehouse Inventory").

58. The Warehouse Inventory had 56,241 separate rows, each containing a unique identification number in a column labeled "ID." The Warehouse Inventory also had a column labeled "Quantity" that identified a total of 334,930,491 items.

59. On May 16, 2025, XL Specialty asked Defendants when they would be available for their EUOs.

60. Defendants told XL Specialty on May 22, 2025 that they were working on scheduling the Examination Under Oath and were "in the process of preparing a revised damages inventory." Defendants also requested a "blank Proof of Loss form specific to this claim."

61. XL Specialty informed Defendants by email on May 29, 2025 that "it was not requesting or accepting submission of a proof of loss until completion of the examination(s) under oath." XL Specialty additionally stated that it continued to reserve all rights as outlined in the ROR Letter and would "advise when and if such submissions are necessary consistent with the policy." Finally, XL Specialty asked for dates for the EUOs of Yossi Malamud and Samuel Malamud.

62. On June 30, 2025, XL Specialty emailed Defendants advising that XL Specialty continued to request Defendants' availability for EUOs.

63. On July 8, 2025, XL Specialty wrote to Defendants as a "reminder" for Defendants "to comply with the obligation to sit for EUOs under the policy and the parallel duty to cooperate."

64. By letter dated July 18, 2025, Defendants provided XL Specialty with a "refined damage inventory of stamps damaged in the October 27, 2024 loss."

65. Included with Defendants' July 18, 2025 letter was an excel spreadsheet that constituted the "refined damage inventory of stamps damaged in the October 27, 2024 loss" (hereinafter the "Revised Claim Submission").

66. The Revised Claim Submission contained the following caption:

SUPERIOR ADJUSTERS INC.
EXPERIENCE | SERVICE | RESULTS
66 Route 59 Suite 200
Monsey, NY, 10952
845-426-7200
info@superioradjusters.com
www.superioradjusters.com

| | |
|---|---|
| INSURED: | Ideal Stamp Co Inc |
| LOSS LOCATION: | 32 Jefferson St. Monticello, NY |
| DATE OF LOSS: | 10/27/2024 |
| TYPE OF LOSS: | Fire |
| POLICY NUMBER: | UMA0017371SP23A |
| CLAIM NUMBER: | 0010639863 |
| INSURANCE COMPANY: | XL Specialty Insurance Co. |
| SELLING VALUE INVENTORY TOTAL: | $55,170,147.99 |
| LESS 15% AS PER POLICY | $46,894,625.79 |

67. The Revised Claim Submission had 517 rows, each containing a unique identification number in a column labeled "ID#." These rows also contained numbers for "Quantity," "Selling Price," and "Total Selling Price Value."

68. The Revised Claim Submission had a total "Quantity" of 6,443,956 items and the collective "Total Selling Price Value" was $55,170,147.99.

69. The following eight items in the Revised Claim Submission had a collective "Total Selling Price Value" of over $15,000,000:

| Line # | Pallet # | Box | ID # | IGPC Stock | Country | Scott | Description of Property | Printer Job | Qty. | Selling Price | Total Selling Price Value | Link |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 355 | | 47628 | 3048 | PAL9505C0 | Palau | 365 | $10 FISH DEFINITIVE | | 75,000 | $25.00 | $1,875,000.00 | link |
| 370 | | 47636 | 3038 | PAL9501C0 | Palau | 358 | FISH DEFINITIVE, 32C | | 50,000 | $32.05 | $1,602,500.00 | link |
| 371 | | 47636 | 3036 | PAL9501C0 | Palau | 357 | FISH DEFINITIVE 20C | | 48,000 | $32.05 | $1,538,400.00 | link |
| 386 | | 74735 | 20930 | PNG0510C0 | Papua New Guinea | 1207 | 50th anniv. Of SIL k 5.35 | | 100,000 | $11.88 | $1,188,000.00 | link |
| 485 | | 50489 | 43848 | LES9206CO | Lesotho | 827-40A | Butterflies | | 70,000 | $20.00 | $1,400,000.00 | link |
| 486 | | 50458 | 43849 | LES9206CO | Lesotho | 827-40A | Butterflies | | 125,000 | $20.00 | $2,500,000.00 | link |
| 487 | | 50424 | 43850 | LES9206CO | Lesotho | 827-40A | Butterflies | | 125,000 | $20.00 | $2,500,000.00 | link |
| 488 | | 50448 | 43851 | LES9206CO | Lesotho | 827-40A | Butterflies | | 140,000 | $20.00 | $2,800,000.00 | link |

70. These same eight items were also identified in the Warehouse Inventory:

| Line # | ID | IGPCStock | Country | Scott | Description | Box | Pallet | PrinterJob | Quantity | Location | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19740 | 3036 | PAL9501CO | Palau | 357 | FISH DEFINITIVE 20C | 47636 | | | 48,000 | | |
| 19742 | 3038 | PAL9501CO | Palau | 358 | FISH DEFINITIVE, 32C | 47636 | | | 50,000 | | |
| 19752 | 3048 | PAL9505CO | Palau | 365 | $10 FISH DEFINITIVE | 47628 | | | 75,000 | | |
| 35915 | 20930 | PNG0510 co | Papua New Guinea | 1207 | 50th anniv. Of SIL k 5.35 | 74735 | | | 100,000 | | |
| 43945 | 43848 | | LESOTHO | 827-40A | BUTTERFLIES | 50489 | | | 70000 | | 70S |
| 43946 | 43849 | | LESOTHO | 827-40A | BUTTERFLIES | 50458 | | | 125000 | | 30S |
| 43947 | 43850 | | LESOTHO | 827-40A | BUTTERFLIES | 50424 | | | 125000 | | 30S |
| 43948 | 43851 | | LESOTHO | 827-40A | BUTTERFLIES | 50448 | | | 140000 | | 20S |

71. Defendants further advised on July 18, 2025 that, while they understood XL Specialty wanted Yossi Malamud to appear for an Examination Under Oath, Yossi Malamud was "no longer employed" with Defendants and, "despite multiple requests, refuses to appear." Accordingly, Defendants would be producing Samuel Malamud, who was "knowledgeable about the facts of the claim."

72. By email dated July 21, 2025, XL Specialty replied to Defendants' Revised Claim Submission as follows:

> AXA XL is in receipt of the inventory – do you have a comparison between the prior submission that calls attention to the changes given the significant increase in the claim presented? We are also confirming potential dates for Sam Malamud's deposition.
>
> We appreciate your notification of Yossi Malamud's departure from the company. However, your communication did not include any explanation of the facts or circumstances surrounding the departure.
>
> Given the nature of the reported loss, this omission is problematic. As detailed in the reservation of rights letter issued by AXA XL, the policy contains exclusions that directly implicate any unexplained losses or shortages, as well as any fraudulent, dishonest, or criminal conduct—including conduct by individuals with an interest in the covered property or who were entrusted with it. The policy also includes a New York-specific endorsement barring coverage for insureds who have made fraudulent statements or engaged in fraudulent conduct in connection with a claimed loss.
>
> In this context, the unexplained departure of a principal involved with the covered property raises a red flag that cannot be ignored. We must understand whether the individual's exit was related to the subject loss, the company's internal investigation, or any other matter potentially bearing on AXA XL's rights and obligations under the policy. AXA XL must also understand if Yossi retains financial interest in the company and the submitted claim.
>
> As you are aware, the insured has a continuing duty to cooperate with the investigation and to produce all requested records and information. That includes transparency regarding the roles and conduct of all individuals who may have had access to or control over the covered property, particularly those who have since departed under unexplained circumstances.
>
> Accordingly, please promptly provide a detailed account of:
>
> The reasons for Yossi Malamud's departure;
>
> The timing and terms of the departure (including whether it was voluntary or involuntary);
>
> Any investigation or review conducted by the company in connection with that departure;
>
> Any statements, records, or other materials related to Yossi's handling of the covered property or involvement in the loss.
>
> Please be advised that AXA XL expressly reserves all rights to deny or limit coverage should the insured fail to provide this and other relevant information. Without clarity on this critical issue, we cannot fully assess the veracity or scope of the claimed loss.
>
> We trust you understand the seriousness of this inquiry and the need for a complete response.

73. On July 23, 2025, Defendants replied to XL Specialty's questions regarding the departure of Yossi Malamud and stated that XL Specialty's request for a "redline copy of the inventory" would be "addressed under separate cover."

74. The next day, July 24, 2026, XL Specialty wrote back to Defendants, noting, among other things, that: "By way of recap, we have either proposed or followed up on EUO dates on March 24, May 16, May 22, May 29, June 30, July 8, and July 10. Despite these continued efforts, no firm date has been scheduled. The insured's cooperation is a condition precedent to coverage. While we appreciate your assurance that Ideal Stamp remains committed to fulfilling its policy obligations, the events described above, viewed together, raise substantial questions that must be address as part of [XL Specialty's] investigation."

75. On July 25, 2025, Defendants emailed XL Specialty and stated that "there is no redline inventory sheet, per se." Instead, "all items from line 305 to the end were added to the supplemental inventory list. There were no changes to the prior 304 line items. The loss is multiples of the policy limits, and the additional items were added solely to provide a clearer sense of the magnitude of Ideal Stamp's loss."

76. The "additional items" "added" in the Revised Claim Submission (line items 305 to 517) had a total "Quantity" of 3,290,817 and a collective "Total Selling Price Value" of $31,478,770.63.

77. Defendants also advised XL Specialty on July 25, 2025 that they "have requested and are now requesting available dates for Sam Malamud's EUO."

78. On August 20, 2025, Defendants provided XL Specialty with "Supplemental photographs in further support of the claimed stamps."

79. On September 9, 2025, XL Specialty conducted an Examination under Oath of Samuel Malamud.

80. By letter to Defendants dated September 25, 2025, XL Specialty advised that it continued to "reserve all rights under the policy, including but not limited to, the right to deny coverage or rescind the policy pursuant to policy exclusions or conditions, by operation of law or equity." XL Specialty also asked that Samuel Malamud "review and execute a print of the [EUO] transcript in the presence of a notary public," and if changes were necessary, they should be made on an errata sheet. Finally, XL Specialty asked Defendants in the September 25, 2025 letter for the following documents requested during the EUO: (1) "P&L for past five years;" (2) "[a]ll photographs of the stamps following the alleged loss;" and (3) a "key for spreadsheet (Exh. 4) that explains the quantity abbreviations in Column I."

81. Samuel Malamud signed the EUO transcript and errata sheet before a notary public on October 16, 2025.

82. On October 17, 2025, Defendants responded to XL Specialty's September 25, 2025 letter and produced Malamud's signed transcript and errata sheet, copies of "Statements of Operations" for the years 2019 to 2024, as well as an abbreviation key. Regarding photographs, Defendants stated: "The insured is still investigating if there are any additional photographs that have not already been supplied to you. If such photographs are discovered, they will be provided under separate cover."

83. The "Statement of Operations" for Ideal Stamp showed as follows:

IDEAL STAMP CO. INC.
STATEMENT OF OPERATIONS
YEARS ENED DECEMBER 31, 2019 2020 2021 2022 2023 2024

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Sales | 1,402,051 | 1,016,103 | 1,229,938 | 1,109,790 | 1,068,874 | 911,336 |
| Cost of Goods Sold | 1,264,419 | 810,349 | 856,609 | 753,924 | 344,465 | 242,581 |
| Gross Profit | 137,632 | 205,754 | 373,329 | 355,866 | 724,409 | 668,755 |
| Officers salaries | 48,480 | 176,160 | 42,500 | - | - | - |
| Salaries & wages | 453,266 | 460,617 | 446,635 | 421,116 | 384,969 | 277,646 |
| Repairs & maintenance | | 2,808 | 3,369 | 3,448 | 9,528 | 13,380 |
| Rents | 145,287 | 152,858 | 158,123 | 171,828 | 145,268 | 140,399 |
| Taxes & licenses | 36,306 | 49,209 | 41,982 | 35,647 | 36,511 | 29,078 |
| Depreciation | 3,742 | 3,742 | 9,789 | 9,789 | 2,691 | - |
| Advertising | 29,240 | 27,372 | 19,783 | 33,659 | 17,301 | 31,006 |
| Auto | 7,381 | 10,113 | 9,298 | 13,497 | 9,055 | 15,608 |
| Bank charges | 24,420 | 23,029 | 10,918 | 7,328 | 4,773 | 1,950 |
| Consultant | | | | | | 131,400 |
| Filing fees | 50 | | | | 3,225 | |
| Insurance | 20,636 | 6,058 | 45,419 | 13,216 | 5,218 | |
| Office | 12,343 | 43,810 | 60,056 | 164,948 | 136,957 | 57,762 |
| Professional fees | 10,263 | 25,113 | 10,262 | 17,613 | 39,242 | (23,091) |
| Telephone | 7,532 | 18,425 | 21,294 | 16,731 | 14,592 | 16,880 |
| Travel | 27,206 | 22,655 | 11,008 | 42,166 | 29,324 | 22,373 |
| Utilities | 12,439 | 13,312 | 15,735 | 15,441 | 16,102 | 18,468 |
| Total expenses | 838,591 | 1,035,281 | 906,171 | 966,427 | 854,756 | 732,859 |
| Income (loss) | (700,959) | (829,527) | (532,842) | (610,561) | (130,347) | (64,104) |

84. The "Statement of Operations" for IGPC showed as follows:

INTER-GOVERNMENTAL PHILATELIC CORP
STATEMENT OF OPERATIONS
YEARS ENED DECEMBER 31, 2019 2020 2021 2022 2023 2024

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Sales | 1,817,380 | 1,829,200 | 1,786,216 | 1,376,848 | 1,447,235 | 757,817 |
| Cost of Goods Sold | 1,272,175 | 753,103 | 1,155,669 | 819,229 | 630,871 | 376,847 |
| Gross Profit | 545,205 | 1,076,097 | 630,547 | 557,619 | 816,364 | 380,970 |
| Officers salaries | 212,333 | 365,160 | 225,000 | 182,000 | 130,000 | - |
| Salaries & wages | 259,499 | 211,180 | 213,982 | 228,721 | 187,020 | 194,508 |
| Rents | 101,585 | 101,531 | 99,844 | 98,097 | 101,531 | 91,205 |
| Taxes & licenses | 36,342 | 45,084 | 40,836 | 34,855 | 32,382 | 20,774 |
| Interest | 46,653 | 925 | | | 8,041 | 8,772 |
| Depreciation | 1,728 | 1,728 | 864 | | | - |
| Advertising | 8,724 | 6,120 | 8,917 | 7,272 | 1,811 | 7,150 |
| Employee benefit programs | 217,702 | 188,869 | 203,103 | 211,402 | 223,704 | 217,885 |
| Auto | 27,015 | 9,018 | 191 | 1,469 | 2,696 | 14,958 |
| Bank charges | 4,809 | 3,414 | 5,031 | 3,585 | 2,561 | 5,451 |
| Consultant | | | | | | 122,178 |
| Commissions | | | 20,796 | | | |
| Computer expense | 9,534 | 6,776 | 3,906 | 9,943 | 1,150 | 13,006 |
| Exhibits | | 2,239 | 3,021 | | | |
| Filing fees | 252 | | | | | |
| Insurance | 59,299 | 33,367 | 50,943 | 57,699 | 68,672 | 141,698 |
| Office | 102,385 | 34,953 | 49,950 | 128,393 | 115,238 | 89,727 |
| Professional fees | 23,762 | 35,429 | 9,725 | 17,224 | 58,485 | 32,475 |
| Telephone | 17,072 | 2,883 | 253 | 5,148 | 1,052 | 230 |
| Travel | 73,440 | 11,548 | 25,383 | 66,992 | 36,369 | 14,113 |
| Utilities | | | | | | |
| Total expenses | 1,202,134 | 1,060,224 | 961,745 | 1,052,800 | 970,712 | 974,130 |
| Income (loss) | (656,929) | 15,873 | (331,198) | (495,181) | (154,348) | (593,160) |

## NOTICE OF RESCISSION & DECLINATION

85. XL Specialty notified Defendants on January 30, 2026 that it was rescinding the Policy and tendered the premium.

86. Defendants concealed and/or mispresented material facts and circumstances that XL Specialty justifiably relied on when issuing the Policy. Had Defendants disclosed to XL Specialty the true facts, XL Specialty would not have issued any policy to Defendants or would not have issued the Policy.

87. In the alternative, XL Specialty declined coverage on the grounds that the Claim is barred by Exclusion D(12) of the Policy as set forth above.

**COUNT I**
**(Rescission of the Policy)**

88. XL Specialty repeats and reiterates Paragraphs 1-87 above as if set forth at length herein.

89. Defendants made misrepresentations and omissions of material fact concerning the value of their inventory when applying for insurance coverage from XL Specialty.

90. Defendants made these misrepresentations and omissions of material fact with full knowledge and expectation that XL Specialty would rely on those representations, which were a material and critical part of XL Specialty's consideration of the risk and determination to issue the Policy.

91. XL Specialty justifiably relied on Defendants' representations in determining whether to issue the Policy.

92. If XL Specialty had known the true facts, XL Specialty would not have issued any policy to Defendants or would not have issued the Policy.

93. XL Specialty is therefore entitled to a declaration that the Policy is rescinded and void *ab initio.*

**COUNT II**
**(No Coverage Under the Policy)**

94. XL Specialty repeats and reiterates Paragraphs 1-93 above as if set forth at length herein.

95. In the alternative, if the Policy is not rescinded, there is no coverage under the Policy for the Claim.

96. Based on Defendants' misrepresentations and omissions of material fact in the Insurance Application, and subsequent submissions to XL Specialty in support of their Claim,

including but not limited to their materially increasing inventory valuations, Defendants' Claim is excluded by the following Policy exclusion:

> **12.** Any fraudulent, dishonest, or criminal act or acts by:
>
> **a.** You, anyone else with an interest in the Covered Property or your or their employees whether or not committed alone or in collusion with others, whether or not such act or acts be committed during the hours of employment; or
>
> **b.** Anyone entrusted with the Covered Property. This exclusion does not apply to a carrier for hire.

97. XL Specialty is therefore entitled to a declaration that there is no coverage under the Policy for the Claim.

**WHEREFORE**, XL Specialty prays for the following relief:

a. a declaration that the Policy is void *ab initio;*

c. in the alternative, if the Policy is not rescinded, for a declaration that there is no coverage under the Policy for the Claim;

d. an award of XL Specialty's attorneys' fees and costs; and

e. for such other relief as the Court may deem equitable and just.

Dated: New York, New York
July 31, 2026

MOUND COTTON WOLLAN & GREENGRASS LLP

By: */s/ Amy J. Kallal*________________________

Lloyd A. Gura
Amy J. Kallal
One New York Plaza
New York, New York 10004
(212) 804-4200
LGura@moundcotton.com
AKallal@moundcotton.com

*Attorneys for Plaintiff XL Specialty Insurance Company*